KENTUCKIANS FOR THE
COMMONWEALTH, et al.,                                              PLAINTIFFS,

v.

U.S. ARMY CORPS OF ENGINEERS, et al.,                             DEFENDANTS.

## <u>MEMORANDUM OPINION</u>

Plaintiffs, Kentuckians for the Commonwealth ("KFTC") and the Sierra Club, brought this action seeking a declaration that the U.S. Army Corps of Engineers ("the Corps") violated the Clean Water Act ("CWA") and the National Environmental Policy Act ("NEPA") in issuing a permit to Leeco, Inc. ("Leeco"), authorizing the corporation to mine-through and fill several unnamed tributaries of Stacy Branch and Yellow Creek. Plaintiffs request injunctive relief and seek judicial review of the agency's decision under the Administrative Procedure Act ("APA").

Currently before the Court are a series of cross motions for partial summary judgment. First, Plaintiffs filed their Motion for Partial Summary Judgment on January 28, 2013, as to their human health effects claims in Counts I, II, and III. (DN 21.) Defendants responded with their own Motions for Partial Summary Judgment, (DN 33 & 34), to which Plaintiffs filed a combined response. (DN 40.) Defendants have replied. (DN 44 & 45.) Upon leave from the Court, Plaintiffs have also filed a surreply. (DN 54.)

Thereafter, the Court requested expedited briefing as to Plaintiffs' water quality claims in Count IV of their Complaint. Plaintiffs filed their Motion for Partial Summary Judgment on July 8, 2013. (DN 62.) Defendants responded with their own combined Motions for Partial Summary

Judgment and responses, (DN 66 & 68), to which Plaintiffs filed a combined reply. (DN 69.) These matters are now ripe for adjudication.

For the following reasons, Plaintiffs' Motion as to Counts I, II, and III (DN 21) and as to Count IV (DN 62) are DENIED and Defendants' Motions (DN 33, 34, 66 & 68)) are GRANTED.

## FACTUAL AND PROCEDURAL BACKGROUND

Surface mining entails the excavation of rock to expose and remove coal seams. Once the coal is extracted, as much as possible of the excavated rock (called "spoil") is returned to the mine site in an attempt to restore natural ground contour. However, because the loosening of the rock and soil and incorporation of air causes the spoil to "swell" to occupy more volume, much cannot be returned to the area where it was blasted. Rather, the spoil is placed in "fills" located in adjacent hollows ("hollow fills" or "valley fills") that, due to the landscape of the Central Appalachian region, often contain headwater streams. As discussed in further detail below, surface mining laws require that the drainage from both hollow fills and "mine through" areas pass through sediment control ponds or structures before being discharged into downstream waters. Each of these activities is subject to a series of overlapping permits and certifications involving both federal and state agencies, one of which is at issue here.

Plaintiffs initiated this challenge in October 17, 2012, after the Corps' Louisville District Office issued Permit No. LRL-2007-217 ("the Permit") and its accompanying Permit Evaluation and Decision Document ("Decision" or "Decision Document") to Intervening Defendant Leeco, pursuant to Section 404(a) of the CWA, 33 U.S.C. § 1344(a). The Permit authorizes Leeco to discharge fill materials into streams that qualify as "waters of the United States" under the CWA and accompanying regulations. The discharges relate to Leeco's plan to construct one hollow fill,

one sediment control pond, and various "mine throughs" on unnamed tributaries of Stacy Branch and Yellow Creek of Carr Creek, located in Knott and Perry Counties, Kentucky, as part of its nearby surface coal mining operations.

On February 7, 2007, Leeco filed its original application for a permit under CWA § 404 to discharge fill material into the waters of the United States. Leeco's original proposal sought to construct six hollow fills and six sediment control ponds in various unnamed tributaries of Carr Creek. The proposed construction involved discharges into 22,761 linear feet of stream. As part of its application, Leeco submitted the Kentucky Division of Mine Permits' ("KDMP") authorization of the mine.

The Corps issued public notice for Leeco's application on April 17, 2007, with a comment period extending through May 16, 2007. During this time period, Margaret Janes, on behalf of various environmental groups, submitted comments objecting to issuance of the permit. Leeco subsequently advised the Corps that it intended to supplement its application on various issues, including avoidance and minimization, water monitoring, and mitigation.

Then, on June 11, 2009, the Department of the Army, the Environmental Protection Agency ("EPA"), and the U.S. Department of the Interior ("DOI") entered into a Memorandum of Understanding ("MOU") announcing the implementation of an interagency plan to reduce the harmful environmental consequences of surface coal mining in Appalachia. One of the elements of this plan was an "enhanced coordination process" regarding Section 404 permit applications for certain Appalachian surface coal mining activities submitted prior to the MOU's execution.[1] Leeco's application was one that was recommended for additional coordination and review.

_____

[1] As both the Corps and Leeco note in their supporting memoranda, the MOU's coordination procedures were set aside by the United District Court for the District of Columbia. *Nat'l Mining Ass'n v. Jackson*, 816 F. Supp. 2d 37 (D.D.C. 2011). An appeal in that case is pending.

Accordingly, a 60-day formal coordination period began in September 2010 and was extended several times by mutual agreement. During the coordination period, the EPA advised the Corps that, based on its review of Leeco's permit application, it had "significant concerns" in five areas, including the avoidance and minimization of adverse environmental impacts, water quality monitoring, mitigation, and fill placement optimization. (EPA Letter 10/22/2010, Ex. D, DN 34-5.) The fifth, titled "NEPA and Environmental Justice issues," addressed the EPA's concerns that "the proposed project may have significant human health impacts on the surrounding communities, all of which are low-income communities." (*Id.*) The EPA outlined its concerns in further detail in a subsequent communication with the Corps. (EPA Letter 12/14/2010, Ex. E, DN 34-6.)

After engaging in this coordination process, Leeco submitted a revised permit application on July 19, 2011. The revised configuration proposed construction of a single, large hollow fill and sediment pond. The new design would "impact"—Defendants' term—or "destroy"—Plaintiffs' term—a total stream length of 18,268 linear feet, or 3.5 miles, reducing the original proposal's impact by 4,593 linear feet. As mitigation, Leeco proposed to pay $752,047.50 to the Kentucky Department of Fish and Wildlife Stream and Mitigation Trust Fund for restoration projects in the vicinity of the project area. Leeco also agreed to restore 3,617 linear feet of streams at the Spring Branch Mitigation Site in Wolfe County, Kentucky. The revised application also included a Compensatory Mitigation Plan ("CMP") for the Spring Branch site, which describes the location, goals and objectives, performance standards, and monitoring plan for the mitigation project.

Due to the revisions, the Corps issued an addendum to the Public Notice on August 5, 2011, with a comment period extending through August 19, 2011. On behalf of Sierra Club, Margaret Janes submitted comments objecting to the proposal ("August Comments"). The August

Comments quoted excerpts from three studies that "have shown that coal mining has significant, negative impacts on the health of those living in the coal fields" and cited the portion of the EPA's October 22, 2010, letter discussing NEPA and environmental justice issues. (Janes Comments 8-8-11, Ex. C, 58-59, DN 21-3.) On November 11, 2011, Sierra Club submitted supplemental comments that, in addition to the previous information in the August Comments, included another study linking increased birth defects to mining activities. (Janes 11-11-11 Comments, Ex. G, 9-10, DN 21-7.) The comments also contained a number of sections dedicated to mitigation issues. (*Id.* at 31-51, 59-62.) On February 15, 2012, at the Corps' request, Leeco submitted a response to the Sierra Club's comments.

On April 3, 2012, the EPA informed the Corps it had no further concerns regarding the proposed project. On May 25, 2012, the Corps completed its review. In its decision, the Corps found awarding the permit would "not significantly affect the quality of the human environment" and that, therefore, no environmental impact statement was required under the NEPA. (Permit Evaluation and Decision Document, 52, DN 28-2.) The permit went into effect on July 26, 2012.

On October 17, 2012, Plaintiffs filed the present civil action. In Count I of their Complaint, Plaintiffs argue that the Corps failed to take the required "hard look" at environmental impacts under NEPA. In Count II, Plaintiffs argue that the Corps did not consider or prevent adverse effects on human health and welfare as required by the CWA's Section 404(b)(1) Guidelines. Count III alleges that the Corps failed to consider the needs and welfare of the people, in violation of the Corps' public interest review regulations at 40 C.F.R. § 320.4, by refusing to consider or address any potential human health impacts of the Permit. Finally, Count IV asserts that the Corps violated the CWA Section 404(b)(1) Guidelines by issuing a permit that will cause or contribute to violations of water quality standards and significant degradation of waters of the

United States. Plaintiffs seek a declaration that the Corps' issuance of the Permit violated the APA, CWA, and NEPA; the vacating of the Permit; an injunction prohibiting the Corps from authorizing further discharges of fill material at the project site until the Corps complies with the CWA and NEPA; and attorneys' fees and expenses.

On November 28, 2012, the Court granted Leeco's Motion to Intervene. (DN 9.) On January 28, 2013, Plaintiffs filed their Motion for Partial Summary Judgment with respect to their human health impact claims. In response, on February 26, 2013, both Leeco (DN 33) and the Corps (DN 34) filed their own motions seeking summary judgment on the same claims. Plaintiff also filed a Motion to Consider Evidence outside the Record with respect to their CWA claims under Count IV (DN 28), which the Court denied in a June 12, 2013, Memorandum Opinion and Order. (DN 58.) Thereafter, the Court set an expedited briefing schedule for anticipated cross-motions for partial summary judgment on the remaining count of Plaintiffs' Complaint, which alleges that the Corps violated the CWA Section 404(b)(1) Guidelines by issuing a permit that will cause or contribute to violations of water quality standards and significant degradation of waters of the United States. Those cross-motions since have been filed (DN 62, 66, 69.)

## STATUTORY BACKGROUND

### I. Surface Mining Control and Reclamation Act

The Surface Mining Control and Reclamation Act ("SMCRA") was enacted to establish "a nationwide program to protect society and the environment from the adverse effects of surface coal mining." 30 U.S.C. § 1202(a). Although Congress acted to protect the environment, it also recognized coal's utility as "an essential source of energy" and sought to balance those dual interests. *Id.* § 1202(f). SMCRA "utilizes a 'cooperative federalism' approach, allocating responsibility for the regulation of surface coal mining among both state and federal agencies."

*Bragg v. W. Va. Coal Ass'n*, 248 F.3d 275, 288 (4th Cir. 2001). Where a state's regulatory program has been approved by the Secretary of the Interior as satisfying the Act's minimum requirements, the state has "exclusive jurisdiction over the regulation of surface coal mining and reclamation operations" on non-Federal lands. 30 U.S.C. § 1253(a). Thus, any party who engages in surface coal mining must obtain and comply with a permit issued by the state's regulatory authority.[2] *Id.* § 1256(a). In Kentucky, the federally approved regulatory authority is the Department of Natural Resources, through the KDMP. *See Sierra Club v. ICG Hazard, LLC*, 2012 WL 4601012, *2 (E.D. Ky. Sept. 28, 2012).

"Regulation of the disposal of excess spoil material from surface coal mining operations is within SMCRA's purview." *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 189-90 (4th Cir. 2009). SMCRA requires that all excess spoil material from surface mining operations be disposed of "in a controlled manner . . . and in such a way to assure mass stability and to prevent mass movement." 30 U.S.C. § 1265(b)(22)(A). "The Act clearly contemplates that valley fills will be used in the disposal process." *Aracoma Coal*, 556 F.3d at 190 (quoting 30 U.S.C. § 1265(b)(22)(D)).

## II.    Clean Water Act

Although SMCRA contemplates the use of valley fills, a SMCRA permit alone is insufficient to allow a mine operator to construct a valley fill; mining companies must also obtain certain permits under the CWA. The CWA establishes a comprehensive program "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. §

---

[2] Where a state does not have a federally approved SMCRA program in place, surface mining operations within that state must be permitted by the DOI's Office of Surface Mining Reclamation and Enforcement ("OSM"). 30 U.S.C. § 1256.

1251(a). To achieve this goal, the CWA prohibits the discharge of any "pollutant" into "navigable waters" of the United States without a permit. *See* 33 U.S.C. §§ 1311(a) *and* 1344(a).

The CWA authorizes the discharge of pollutants into U.S. waters through two permit programs. First, a mine operator must obtain a National Pollutant Discharge Elimination System ("NPDES") permit under CWA § 402, which authorizes discharges of pollutants from a point source within the mining operation, such as a sediment pond, into navigable waters. *Id.* §§ 1342; 1362(12). Second, and more importantly for the purposes of this litigation, to dispose of excess spoil in jurisdictional waters, a surface mining company must obtain a CWA § 404 permit from the Corps.[3] Section 404 permits allow "the discharge of dredged or fill material into the navigable waters at specified disposal sites." *Id.* § 1344(a).

In issuing § 404 permits, the Corps must comply with the § 404(b)(1) Guidelines ("Guidelines"), which are promulgated by the EPA pursuant to 33 U.S.C. § 1344(b)(1), and incorporated by the Corps into its own regulations. *See* 40 C.F.R. pt. 230 *and* 33 C.F.R. § 320.2(f). The Guidelines provide that the Corps may not permit discharges that "will cause or contribute to significant degradation of the waters of the United States." 40 C.F.R. § 230.10(c). Under the Guidelines, a discharge contributes to significant degradation if it has "[s]ignificantly adverse effects" on human health or welfare; life stages of aquatic life and other wildlife dependent on aquatic ecosystems; aquatic ecosystem diversity, productivity, and stability; or recreational, aesthetic, and economic values. *Id.*

In addition to complying with the § 404(b)(1) Guidelines, the Corps must also conduct a public interest review, balancing the "benefits which reasonably may be expected to accrue from the proposal" against "its reasonably foreseeable detriments." 33 C.F.R. § 320.4(a)(1). Part of

---

[3] Before the Corps issues a CWA § 404 permit, an applicant is also required to provide certification from the proper state authority that the proposed project will comply with state water quality standards under CWA § 401. *See* 33 U.S.C. § 1341.

this public interest review incorporates consideration of the general "needs and welfare of the people." *Id.* Where a permit complies with the Guidelines and meets other applicable criteria, the Corps will grant a permit "unless the district engineer determines that it would be contrary to the public interest." *Id.*

On March 31, 2008, the EPA and the Corps issued revised regulations governing compensatory mitigation for authorized impacts to wetlands, streams, and other waters of the United States under CWA Section 404, 33 U.S.C. § 1344 ("2008 Mitigation Regulations"). These regulations are designed to improve the effectiveness of compensatory mitigation to replace lost aquatic resources functions and area, expand public participation in compensatory decision making, and increase the efficiency and predictability of the mitigation project review process. 33 C.F.R. Pt. 332; 40 C.F.R. §§ 230.91-98. These regulations apply to applications received after April 10, 2008. 73 Fed. Reg. 19594. (Apr. 10, 2008) ("This final rule will apply to permit applications received after the effective date of this rule . . . .").

## III.    National Environmental Policy Act

In addition to compliance with the CWA, NEPA places additional requirements on the Corps when considering a § 404 permit application. Congress enacted NEPA to "promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." 42 U.S.C. § 4321. NEPA achieves this purpose "through a set of 'action-forcing' procedures that require that agencies take a 'hard look' at environmental consequences" when contemplating agency action. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). NEPA is a procedural statute, not a substantive one. *Id.* (citations omitted) ("Although [NEPA] procedures are almost certain to affect the agency's substantive decision, it is now well settled that NEPA itself does not mandate particular results, but simply prescribes

the necessary process."). Thus, agency action that produces adverse environmental effects may still be NEPA-compliant so long as the agency considered the adverse effects and determined that competing policy values outweigh those costs. *Id.*

NEPA requires that federal agencies prepare a "detailed statement," known as an Environmental Impact Statement ("EIS"), for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Whether an action's effects are significant is determined by evaluating both the context of the action and the intensity, or severity, of the impact. 40 C.F.R. § 1508.27. "When, as in this case, the agency determines that it is not clear whether the license application requires an environmental impact statement, the regulations direct the agency preliminarily to prepare an environmental assessment," or EA. *Save Our Cumberland Mountains v. Kempthorne*, 453 F.3d 334, 339 (6th Cir. 2006) (internal quotation marks omitted) (citing 40 C.F.R. § 1501.4(b)). Based on the EA, the agency either determines an EIS is required or, as the Corps did here, "instead may issue a finding of no significant impact [("FONSI")]—a document by a Federal agency briefly presenting the reasons why an action . . . will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared." *Id.* (quoting 40 C.F.R. § 1508.13) (internal quotation marks omitted); *see also* 33 C.F.R. § 230.11.

## STANDARD

Generally, summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). However, in the case of a district court reviewing final agency action, the rules governing summary judgments do not apply because of the limited role of a court in reviewing the administrative record. *See City of Cleveland v. Ohio*, 508 F.3d 827 (6th

Cir. 2007); *N.C. Fisheries Ass'n, Inc. v. Gutierrez*, 518 F. Supp. 2d 62 (D.D.C. 2007); *J.N. Moser Trucking, Inc. v. U.S. Dep't of Labor*, 306 F. Supp. 2d 774 (N.D. Ill. 2004) (stating that a district court's opinion on an appeal from a final agency action may be triggered by motions for summary judgment, but the judicial review of an agency's final determination follows standards quite different from those applied in a typical summary judgment proceeding). When "reviewing administrative agency decisions, the function of the district court is to determine whether or not as a matter of law, evidence in the administrative record permitted the agency to make the decision it did. . . ." *Sierra Club v. Dombeck*, 161 F. Supp. 2d 1052, 1064 (D. Ariz. 2001) (citing *City & Cnty. of San Francisco v. United States*, 130 F.3d 873, 877 (9th Cir. 1997)).

The APA states "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be—arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The APA limits the scope of judicial review to a review of the administrative record only. 5 U.S.C. § 706 ("[T]he court shall review the whole record or those parts of it cited by a party"); *Fla. Power & Light Co. v. Lorton*, 470 U.S. 729, 734 (1985); *Camp v. Pitts*, 411 U.S. 138, 142 (1973). Under the "arbitrary and capricious standard, the standard is narrow and the court should not substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The court should be particularly deferential to the agency decisions when it implicates substantial agency expertise or regards scientific matters within its area of expertise. *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 377-78 (1989); *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 103 (1983). However, "while the arbitrary and capricious standard of review is highly deferential, it is by no means a rubber stamp." *U.S. v. Garner*, 767 F.2d 104, 116 (5th Cir. 1985). Though the court is deferential to the agency decision, the agency

must still "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* (citing *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). An agency decision would be considered arbitrary and capricious if:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.*

In sum, in order to "survive summary judgment under the APA, the [party seeking judicial review] must point to facts or factual failings in the administrative record that indicate that the [agency's] decision is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' If the plaintiffs cannot do so, then the [agency's] decision stands." *Shenandoah Ecosys. Def. Grp. v. U.S. Forest Serv.*, 144 F. Supp. 2d 542, 547 (W.D. Va. 2001).

## DISCUSSION

### I.    Standing

Plaintiff Kentuckians for the Commonwealth ("KFTC") is a "statewide citizen's organization working . . . to help Kentuckians enjoy a better quality of life; to help develop communities with good jobs that do not damage Kentucky's water, air, land, or human health; and to ensure that all Kentuckians have health care, shelter, food, education and other basic needs." (Pls.' Compl. ¶ 8.) Plaintiff Sierra Club is a nonprofit corporation with more than 600,000 members, approximately 5,000 of whom reside in Kentucky and belong to its Cumberland Chapter. (*Id.* ¶ 9.) "The Sierra Club's concerns encompass the exploration, enjoyment[,] and protection of surface waters, mountains, and wildlife in Kentucky." (*Id.*)

In its Motion for Partial Summary Judgment on Counts I, II, and III, (DN 33), Leeco argues Plaintiffs lack standing to bring this action. An organization or association of individuals who brings suit against a federal agency must make a series of showings to establish standing. First, it must demonstrate that "(1) the organization's members would otherwise have standing in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the law suit." *Id.* (quoting *Friends of Tims Ford v. Tenn. Valley Auth.*, 585 F.3d 955, 966 (6th Cir. 2009)). Leeco principally challenges the first prong of associational standing, arguing that the Plaintiffs' members do not have standing in their own right to challenge the Permit.[4]

In order to establish standing under the APA, a plaintiff must prove the "case or controversy" constitutional requirements of Article III and "demonstrate the inapplicability of 'prudential' limitations imposed by the APA." *Ctr. for Biological Diversity v. Lueckel*, 417 F.3d 532, 536 (6th Cir. 2005). To prove Article III's constitutional requirements, Plaintiffs' members must demonstrate: (1) an "injury in fact" that is both "concrete and particularized" and "actual or imminent"; (2) "the injury is fairly traceable to the challenged action of the defendant"; and (3) the injury will likely be redressed with a favorable decision. *Heartwood, Inc. v. Agpaoa*, 628 F.3d 261, 266 (6th Cir. 2010) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-81 (2000)). Furthermore, the APA imposes two additional requirements for

---

[4] Leeco also argues that Plaintiffs lack associational standing to complain about the Corps' alleged failure to adequately consider environmental justice concerns because they are not germane to Plaintiffs' organizational purposes. Leeco argues that Sierra Club's purpose of ensuring that "all people have the right to a safe and healthful work and home environment" and KFTC's "broader mission for social justice" and membership that is "open to all people" are too broad to provide standing. However, both groups indicate that their organizations specifically "work[] with disenfranchised populations such as people of color and low-income communities" and that their mission "includes representing the interests of low-income communities that are disproportionately impacted by industrial pollution." (DN 40-3 & 40-4.) The Court disagrees that Plaintiffs' organizational purposes are too broad or unrelated to environmental justice issues, and finds Plaintiffs have satisfied this prong of the standing requirements.

standing, although they "overlap substantially" with Article III's requirements. *Ctr. For Biological Diversity*, 417 F.3d at 536. Plaintiffs who sue a federal agency must also show that (1) the complaint "relate[s] to agency action, which is defined to include failure to act" and (2) they "suffered either legal wrong or an injury falling within the zone of interests sought to be protected by the statute on which [its] complaint is based." *Heartwood, Inc.*, 628 F.3d at 266 (alterations in original) (quoting *Ctr. For Biological Diversity*, 417 F.3d at 536) (internal quotation marks omitted).

Leeco argues that Plaintiffs' members have not alleged a concrete and particularized injury, or an "injury in fact." Specifically, Leeco argues that because the effects of mining on human health are "uncertain," such grounds are inadequate to confer standing, citing *Amigos Bravos v. U.S. Bureau of Land Management*, 816 F. Supp. 2d 1118 (D.N.M. 2011), in support. However, the plaintiffs' alleged injuries in *Amigos Bravos* involved the potential effects of climate change that would allegedly result from oil and gas lease sales at issue. There, the court noted that it could take decades or centuries to determine the effects of climate change on individual geographic areas; therefore, any injury alleged by plaintiffs would be pure conjecture. *Id.* at 1129-30. This is distinguishable from the situations of Plaintiffs' members, who live, work, and recreate in close proximity to a mining operation that will create noise, emit particles, and utilize a contested permit to fill nearby streams with overburden. The Court does not find this argument persuasive.

Furthermore, affidavits from Plaintiffs' members allege a number of other injuries than concerns based on the human health studies at issue in this case. Plaintiffs' members live, work, and recreate near the mine site and the proposed fill sites. For example, KFTC member Cleveland Smith, who lives less than a quarter mile from the Stacy Branch mine site, is worried

about the effects of water pollution on his family's vegetable garden, noise from the mining activities, and frequently goes four-wheeling near the streams affected by the Permit. Smith avers that he will take extra precautions such as limiting his time outside and is considering moving out of the area because of the Stacy Branch mine. Sierra Club member Joey Shadowen, a Lexington resident, frequently goes backpacking and hiking in eastern and southern Kentucky. Specifically, Shadowen has hiked in the areas near the Stacy Branch mine site since he was a boy and, though he would like to continue his visits, he would no longer hike in the area out of concern for his safety and because mining would destroy the area's aesthetic beauty. On his hikes, Shadowen wades in the streams to take photographs and uses them as a source of drinking water, practices he will discontinue because of the presence of selenium and other chemicals used in the mining process.

The Supreme Court, in *Friends of the Earth, Inc. v. Laidlaw Environmental Services*, stated "[w]e have held that environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." 528 U.S. at 183 (citing *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)). The Plaintiffs in this case have so averred. The Court finds that Plaintiffs' members have stated a particularized injury that is imminent. Leeco does not contest that the traceability and redressability prongs are met, and the Court finds that Plaintiffs satisfy these as well. Plaintiffs have met Article III's standing requirements.

Although a separate inquiry, the prudential standing requirements "overlap substantially" with the constitutional requirements of standing. *See Ctr. For Biological Diversity*, 417 F.3d at 536. First, "the plaintiff's complaint must relate to agency action, which is defined to include failure to act." *Id.* (internal quotation marks omitted). It is undisputed that the Corps' grant of a

fill permit under Section 404 constitutes agency action within the meaning of the APA. Second, and at issue here, "the plaintiff must have suffered either 'legal wrong' or an injury falling within the 'zone of interests' sought to be protected by the statute on which his complaint is based." *Id.* (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990)). Whether a claim is within the zone of interests protected by a statute is to be evaluated "not by reference to the overall purpose of the Act in question . . . but by reference to the particular provision of law upon which the plaintiff relies." *Bennett v. Spear*, 520 U.S. 154, 175-76 (1997).

Despite Leeco's argument to the contrary, the Court finds that Plaintiffs have alleged injuries within the zone of interests sought to be protected by both the CWA and NEPA. The goal of the CWA "is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Specifically, § 404(e) deals only with general permits for discharges of dredged or fill material into navigable waters. *Id.* § 1344(e). Similarly, NEPA is designed to "promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." 42 U.S.C. § 4321. Leeco argues that because Plaintiffs complain about injuries caused by downstream water quality impacts, their injuries fall under the zone of interests protected by a § 402 NPDES permit and not a § 404 fill permit. The Court does not view the "zone of interests" inquiry so narrowly. *See Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987) (The zone of interests test is "not meant to be especially demanding"); *see also Davis by Davis v. Philadelphia Hous. Auth.*, 121 F.3d 92, 97-98 (3d Cir. 1997) (same). Plaintiffs argue that the Corps did not adequately evaluate whether the issuance of the Permit would detrimentally impact public health and the public interest. Although they reference injuries based on the effects of mining generally, Plaintiffs' members also specifically allege injuries that the Permit's filling of nearby waters would have on their health, aesthetic, and

recreational interests. Consequently, Plaintiffs have satisfied the APA's additional standing requirements, and the Court will consider the merits of their arguments.

## II. Human Health Effects Claims: Counts I, II, & III

### A. The Corps Did Not Violate NEPA

Plaintiffs argue that, in issuing a FONSI, the Corps violated NEPA because it had no reasoned basis for concluding that the Permit's effects on human health would be individually or cumulatively insignificant. As stated above, NEPA is a procedural statute. Thus, "[t]he statute is meant to ensure that an agency's decision is informed; it provides no basis for judgment as to whether an informed decision is also correct or wise." *Natural Res. Def. Council, Inc. v. U.S. Army Corps of Eng'rs*, 2010 WL 1416681, *2 (N.D. Ohio Mar. 31, 2010) (citing *Methow Valley Citizens Council*, 490 U.S. at 351).

As the Fourth Circuit has noted, "NEPA requires federal agencies to take a 'hard look' at the environmental consequences of their actions, but the statute does not specify how an agency should determine the scope of its NEPA analysis." *Aracoma Coal*, 556 F.3d at 194 (citing *Wetlands Action Network v. U.S. Army Corps of Eng'rs*, 222 F.3d 1105, 1115 (9th Cir. 2000)). However, under the Corps' implementing regulations, the proper scope of analysis should "address the impacts of the specific activity requiring a DA [Department of Army] permit and those portions of the entire project over which the [Corps] district engineer has sufficient control and responsibility to warrant Federal review." 33 C.F.R. pt. 325, App. B, § 7(b)(1). The regulations suggest "typical factors" to consider in determining whether sufficient "control and responsibility" exists:

> (i) Whether or not the regulated activity comprises "merely a link" in a corridor type project (e.g., a transportation or utility transmission project).

(ii) Whether there are aspects of the upland facility in the immediate vicinity of the regulated activity which affect the location and configuration of the regulated activity.

(iii) The extent to which the entire project will be within Corps jurisdiction.

(iv) The extent of cumulative Federal control and responsibility

*Id.* § 7(b)(2). Through consideration of these factors, the Corps determines whether "the Federal involvement is sufficient to turn an essentially private action into a Federal action. These are cases where the environmental consequences of the larger project are essentially products of the Corps permits action." *Id.*

Here, the Corps determined that the proper scope of analysis "would include jurisdictional 'waters of the U.S.,' and the immediate adjacent riparian corridor that would be filled directly or indirectly by the construction of the Hollowfill, construction of the sediment pond, and the mining through of streams." (Decision Document, 2-3, DN 28-2.) In other words, the Corps limited the scope of its analysis to impacts on jurisdictional waters and adjacent riparian areas. The Corps continued that broadening the scope would be inappropriate: "because the CWA does not provide the Corps legal authority to regulate surface coal mining activities beyond the limits of the 'waters of the U.S.' Rather, overall surface coal mining operations are permitted by and regulated under SMCRA . . . ." (*Id.*) The Court also issued a FONSI, concluding "issuance or denial of the requested permit would not constitute a major federal action that would significantly affect the quality of the human environment." (*Id.* at 52.) Consequently, no EIS was completed.

The Plaintiffs contend that the Corps erred in limiting the scope of its review to the actual filling of U.S. Waters, arguing that because the mining operations could not proceed without a § 404 permit for fill activities in jurisdictional waters, a larger scope is warranted. In support of

this contention, Plaintiffs cite to *Save Our Sonoran v. Flowers*, 408 F.3d 1113 (9th Cir. 2005) and *White Tanks Concerned Citizens, Inc. v. Strock*, 563 F.3d 1033 (9th Cir. 2009). The Court finds these cases distinguishable, as the Ninth Circuit "was not confronted, as we are, with the problem of overlapping federal and state regulatory schemes." *Aracoma Coal*, 556 F.3d at 197 n.11. As the Fourth Circuit has noted, "the fact that the Corps' § 404 permit is central to the success" of an overall project "does not itself give the Corps 'control and responsibility' over the entire fill." *Id.* at 195 (citing *Wetlands Action Network*, 222 F.3d at 1116-1117). In other words, while true that without the Corps' § 404 permit Leeco would be unable to conduct surface mining operations, to broaden its jurisdiction beyond the filling of jurisdictional waters to the mining project as a whole "is to effectively read out of the equation the elaborate, congressionally mandated schema for the permitting of surface mining operations prescribed by SMCRA." *Id.* at 195; *see also Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004) ("[A] 'but for' causal relationship is insufficient to make an agency responsible for a particular effect under NEPA and the relevant regulations"). As the state regulatory body under SCMRA, it is the KDMP, and not the Corps, that has control and responsibility over the Stacy Branch mine site as a whole. The Corps' decision to limit the scope of its analysis to the waters subject to the Clean Water Act is entitled to deference and is not arbitrary and capricious.

Plaintiffs argue that the Fourth Circuit's holding in *Aracoma Coal* runs contrary to the Sixth Circuit precedent, specifically *Save Our Cumberland Mountains* ("*SOCM*"). 453 F.3d 334. However, *SOCM* is distinguishable. There, the Court held that the federal Office of Surface Mining ("OSM") was required to fulfill its duties under both SMCRA and NEPA in reviewing an application for a mining license. *SOCM* involved a case where federal control was more

expansive,[5] and, again, did not involve overlapping federal and state regulatory schemes. "While SMCRA's provisions should not be construed as 'superseding, amending, modifying, or repealing' the requirements of NEPA or the CWA, neither should NEPA be construed to require the Corps to essentially federalize an environmental review process that has already been delegated to federally approved state programs." *Aracoma Coal*, 556 F.3d at 196 (citations omitted) (quoting 30 U.S.C. § 1292(a)). *SOCM* does not disturb this Court's decision to afford the proper level of deference to the Corps' analysis.

Plaintiffs argue that, even accepting the Corps' decision regarding the proper scope of analysis, the Corps acted arbitrarily and capriciously because it "never concluded that the public health consequences of mining would fall outside of this scope of analysis." (Pls.' Resp., 6, DN 40.) Because the dredging and filling activities are *part of* mining activities as a whole, Plaintiffs argue the Corps acted arbitrarily and capriciously because it did not explicitly say the studies linking coal mining to negative impacts on human health fell outside this scope. The Court disagrees. The Corps indicated that it would limit its scope to consideration of the permitted activities specifically because the KDMP had regulatory authority over "overall surface coal mining operations." Plaintiffs' comments, which the Corps outlined for nearly two pages, referenced studies that analyze the effect of overall surface mining operations on human health. This is specifically what the Corps indicated was outside its regulatory authority. Plaintiffs' argument is essentially another attack on the Corps' decision to limit the scope of its analysis, which this Court has found is entitled to deference. *See also Ky. Waterways Alliance v. Johnson*, 540 F.3d 466, 474 (6th Cir. 2008) ("[E]ven when an agency explains its decision with less than

---

[5] Unlike Kentucky, Tennessee does not have a state authority under SMCRA; thus, the OSM issues SMCRA permits. *See* 30 U.S.C. § 1256.

ideal clarity, a reviewing court will not upset the decision on that account if the agency's path may be reasonably discerned").

In their final challenge under NEPA, Plaintiffs argue that the Corps impermissibly skewed its weighing of harms and benefits in its alternatives section. Plaintiffs specifically point to the Corps' analysis under the "No Action Alternative/Permit Denial" section of its Decision, where it noted that permit denial would result in no new impacts to U.S. waters, and briefly discussed that permit denial would hinder meeting the national demand for energy and adversely impact the local economy through a loss of employment opportunities and taxes. Plaintiffs cite 33 C.F.R. Pt. 325, and argue that because the Corps refused to consider the impacts of operations as a whole, it could not consider the benefits of operations as a whole. *See id.* App. B § 7(b)(3) ("[T]he scope of analysis used for analyzing both impacts and alternatives should be the same scope of analysis used for analysis the benefits of a proposal"). However, as Leeco points out, the Corps did take into account the impacts of the proposal as a whole when it referred to the protections provided by overlapping permits, designed to limit environmental impacts of the operations as a whole. *See, e.g.*, Decision Document at 3 ("The SMCRA . . . ensure[s] the mining operations are designed to minimize adverse environmental effects"). In looking at the record as a whole, the Court does not find the Corps' decision to be impermissibly skewed. *See Natural Res. Def. Council, Inc.*, 2010 WL 1416681 at *6 ("It was sufficient and reasonable for the Corps to note that filling these particular waters would, in and of itself, have a negligible effect on the environment and human use of the United States waters, and yet would allow a project to go forward in a location that would benefit from the jobs and economic advantages of hosting the facility"). For the foregoing reasons, the Court holds that the Corps did not violate NEPA.

### B. The Corps Was Not Obligated to Supplement Its EA

Plaintiffs argue that NEPA obligated the Corps to consider the information provided in an August 17, 2012, letter roughly three weeks after the Corps issued the Permit on July 26, 2012. They contend their letter, which detailed the media attention and Congressional response to the human health studies, constitutes "significant new information" that required a supplemental EA. Regulations require an agency to supplement an EIS or EA where "[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns" or "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1). Here, the new information Plaintiffs provided pertained, again, to the effects of mining activities as a whole. Because the Corps had limited the scope of its analysis to the impacts of the specific permitted activity—the dredging and filling of jurisdictional waters—it was not required to supplement its EA based on the August 17 letter.

### C. The Corps' Review Was Consistent with CWA § 404(b)(1) Guidelines

Plaintiffs also contend that because the Corps did not investigate the human health studies referenced in Plaintiffs' comments, the Corps' review was inconsistent with its obligations under the § 404(b)(1) Guidelines. Under the Guidelines, the Corps must consider the "[s]ignificantly adverse effects of the discharge of pollutants on human health or welfare." 40 C.F.R. § 230.10(c)(1). Under the CWA, "discharge of pollutants" means "any addition of any pollutant to navigable waters from any point source" or "any addition of any pollutant to the waters of the contiguous zone or the ocean from any point source other than a vessel or other floating craft." 33 U.S.C. § 1362(12). The focus of the Corps' inquiry under the Guidelines, then, is limited to the health effects caused by the discharge of pollutants into jurisdictional waters, not discharges

caused by overall mining operations. The Corps' Decision evaluates the factors required under the § 404(b)(1) Guidelines. (*See* Decision Document at 26-30) (considering the Permit's potential effects on the municipal water supply, water-related recreation, aesthetics, safety, air quality, and noise); *see also* 40 C.F.R. §§ 230.50 – .54 (listing as potential effects on human use municipal and private water supplies, water-related recreation, and aesthetics). Again, the Corps' decision to evaluate only the impacts of the specific permitted activities, and not the overall mining project, is entitled to deference. The Corps' Decision adequately evaluates the impacts of the Permit.

Plaintiffs also argue that the Corps was required to "consider the impacts of the Stacy Branch mine not only individually, but also when combined with the effects of other such operations." (Pls.' Mem. in Supp. of Mot. for Partial S. J., 28, DN 23-1.) In support of this contention, Plaintiffs cite to 40 C.F.R. § 230.10(c)(1), which states that, under the Guidelines, "effects contributing to significant degradation considered individually and collectively, include . . . [s]ignificantly adverse effects of the discharge of pollutants on human health or welfare. . . ." Based on this, Plaintiffs argue that the Corps was required to consider the effects of mining on the health of residents in the region. However, under a plain reading of the 40 C.F.R. § 230.10(c)(1), "collectively" refers to the collective effects of "the discharge of pollutants," which, as stated above pertains specifically to the authorized activities under § 404. The Corps was only required to address the collective and cumulative effects of the *authorized discharges*. Again, because the Corps properly determined that its jurisdiction was limited to discharges to waters of the United States, it was not obliged under the Guidelines to consider the cumulative effects of mining operations as a whole.

### D. The Corps' CWA Public Interest Review Was Not Arbitrary and Capricious

In addition to complying with the § 404(b)(1) Guidelines, the Corps must also conduct a public interest review, balancing the "benefits which reasonably may be expected to accrue from the proposal" against "its reasonably foreseeable detriments." 33 C.F.R. § 320.4(a)(1). Part of this public interest review incorporates consideration of the general "needs and welfare of the people." *Id.* Furthermore, Executive Order ("EO") 12,898 requires that federal agencies "identif[y] and address[ ], as appropriate, disproportionately high and adverse human health or environmental effects . . . on minority populations and low-income populations in the United States." Exec. Order No. 12,898, 59 Fed. Reg. 7,629–33 (Feb. 11, 1994). In its Decision, the Corps found that the Permit would not "discriminate on the basis of race, color, or national origin nor would it have a disproportionate effect on minority or low-income communities." (Decision Document, 30, DN 28-2.)

Plaintiffs contend that the Corps' environmental justice analysis was arbitrary and capricious because it failed to consider the human health studies. As discussed in the Corps' Decision, 40.65 of the individuals living within a 1.5-mile radius of the mine are below the poverty level. (*Id.*) Therefore, the Plaintiffs reason, "the demographic makeup of the surrounding community and the health harms associated with mountaintop mining mean that low-income individuals will disproportionately bear the burden of the serious health risks caused by such mining." (Pls.' Mem. at 31.) Plaintiffs contend that because the Corps' environmental justice analysis does not take this into account, its conclusion that the Permit would not disproportionately affect low-income individuals is arbitrary and capricious. Plaintiffs' argument, however, again rests on the premise that the Corps was required to examine the impacts of overall mining operations, which

this Court has rejected. Therefore, the Court finds Defendants are entitled to summary judgment as to these counts of Plaintiffs' Complaint.

### III.    Plaintiffs' Water Quality Claims: Count IV

Plaintiffs also contend the Corps' decision that the permitted activities would not lead to significant degradation of U.S. waters was arbitrary and capricious. Plaintiffs first contend the Corps' determination that the Spring Branch mitigation project and payment of in-lieu fees would compensate for the damage "is procedurally flawed and without support in the record." (DN 63.) Second, Plaintiffs argue that the Corps' determination that downstream waters will not be degraded by conductivity pollution "rests on unspecified and unsupported management plans and ignores the conductivity contributions from over 1100 feet of mine drainage ditches." (*Id.*)

### A.  Applicability of the 2008 Mitigation Regulations

As described above, the EPA and the Corps issued revised regulations governing compensatory mitigation for authorized impacts to wetlands, streams, and other waters of the United States under CWA Section 404, 33 U.S.C. § 1344. The 2008 Mitigation Regulations apply only to applications received after April 10, 2008. Leeco's original application was filed on February 7, 2007. (Decision Document at 1.) A "revised application" was submitted on July 19, 2011. (*Id.* at 2.) Because of the significant revisions, "an addendum to the Public Notice No. LRL-2007-217 was issued on August 5, 2011." (*Id.*) Plaintiffs argue that the 2008 Mitigation Regulations apply to Leeco's application because (1) 33 C.F.R. § 325.2(a), which requires permit decisions within 60 days of receipt of a completed application, caused Leeco's 2007 application to lapse and (2) the 2011 Permit addendum differed from the project proposed in 2007 "in almost all relevant respects."

Much of the Plaintiffs' arguments rely on the 2008 Mitigation Regulations, and the Court is not convinced they apply. First, as Leeco points out in an appendix to its Motion, 33 C.F.R. § 325.2(d) indicates that the district engineer "will be guided by" the time limits, and certain exceptions to the 60-day decision timeline apply, including where issuance is "precluded as a matter of law or procedures required by law." *Id.* § 325.2(d)(3)(i). Certainly the MOU between the EPA, DOI, and Army, which required Leeco's application to undergo an "enhanced coordination process" precluded a decision within the 60-day time period. Furthermore, the Corps' 2012 Decision notes that it addresses "the project as it is now proposed," referring to it as a "revised" application and "addendum." (Decision Document at 1-2.)

Most of the briefing before the Court presumes the 2008 Mitigation Regulations apply. The Corps appears to assume their application without challenging it, and Leeco confines its argument that they do not apply to an appendix attachment, focusing its Motion on why the mitigation plan complies with the 2008 Regulations. As outlined below, even considering the 2008 Regulations, the Corps did not act arbitrarily or capriciously.

### B. The Corps Adequately Addressed Stream Function

Plaintiffs first contend that the Corps failed to assess the likelihood of ecological success and sustainability. Plaintiffs cite to the "general considerations" section of 33 C.F.R. § 332.3, which concerns compensatory mitigation requirements. In pertinent part, the regulation states:

> The district engineer must determine the compensatory mitigation to be required in a DA permit, based on what is practicable and capable of compensating for the aquatic resource functions that will be lost as a result of the permitted activity. When evaluating compensatory mitigation options, the district engineer will consider what would be environmentally preferable. In making this determination, the district engineer must assess the likelihood for ecological success and sustainability, the location of the compensation site relative to the impact site and their significance within the watershed, and the costs of the compensatory mitigation project.

33 C.F.R. § 332.3(a)(1).

The Court finds that the Corps adequately assessed the CMP as required by 33 C.F.R. § 332.3(a)(1). First, the Corps extensively coordinated with Leeco and the EPA prior to Leeco's submittal of a revised mitigation plan. Second, the CMP details the historic impacts and disturbances within the chosen Spring Branch mitigation site, and offers predictions as to the success of mitigation efforts. Specifically, the CMP notes that the Spring Branch mitigation site was initially impacted in the early 1900's by agricultural use, including livestock, tobacco, and timber harvesting. The CMP further indicates the impacts of such use "are evident throughout the project site resulting in degradation to the existing biotic and abiotic factors that determine the structure and function on stream ecology." (CMP, 3, DN 62-2.) Despite the degraded condition, the CMP predicts that because conductivity levels at the site are relatively low, its "natural channel design methodology" will increase overall stream integrity. The CMP then details how the natural channel design methodology will be carried out at the Spring Branch site. (*Id.*). Lastly, as the Corps points out, it assessed the likelihood of ecological success and sustainability by specifying the chances of project failure. Here, the Corps found the mitigation project contained a 20 percent risk of failure using the EKSAP's Stream Compensation Ratio Calculator Sheet.

Plaintiffs argue that the Corps' use of a 20 percent failure risk amount was arbitrary and capricious because it is "completely unsubstantiated" and the Corps failed to consider contrary evidence before issuing the permit. However, as the Corps explains, the number comes from its use of the EKSAP, which it explains in detail throughout the administrative record, including the decision document. Plaintiffs' contention that the Corps did not consider their comments on mitigation is similarly unwarranted. The Decision Document provides a detailed explanation of

both Plaintiffs' comments and Leeco's responses to those comments. Although the Corps did not respond to each individual argument made therein, it included them in their entirety in the Administrative Record and noted that, in reaching its conclusions, it considered "comments received from . . . interested parties to the public notice." (Decision Document at 16.) Thus, the Corps did not ignore contrary evidence in reaching its decision. Rather, it considered it, but opted for a different course than that suggested by the Plaintiffs. Such is not improper, even where reasonable minds could differ on the proper course. The Corps did not act arbitrarily and capriciously in estimating the failure risk of the Spring Branch mitigation project. *See Aracoma Coal*, 556 F.3d at 205 ("When an agency is called upon to make complex predictions within its area of special expertise, a reviewing court must be at its most deferential").

Next, Plaintiffs contend that the Corps' failure to require long-term monitoring of the Spring Branch site was arbitrary and capricious. Under the terms of the CMP, "[m]onitoring will be conducted for a period of five years to ensure that the project meets performance standards." (CMP at 12.) Plaintiffs argue that this was inadequate, and that a longer period was mandated under the 2008 Mitigation Regulations. The relevant regulation provides:

> The mitigation plan must provide for a monitoring period that is sufficient to demonstrate that the compensatory mitigation project has met performance standards, but not less than five years. A longer monitoring period must be required for aquatic resources with slow development rates (e.g., forested wetlands, bogs). Following project implementation, the district engineer may reduce or waive the remaining monitoring requirements upon a determination that the compensatory mitigation project has achieved its performance standards. Conversely the district engineer may extend the original monitoring period upon a determination that performance standards have not been met or the compensatory mitigation project is not on track to meet them. The district engineer may also revise monitoring requirements when remediation and/or adaptive management is required.

33 C.F.R. § 332.6(b). The Corps notes that under this regulation, it has the discretion to extend the original monitoring period "upon a determination that performance standards have not been

met or the compensatory mitigation project is not on track to meet them," *Id.*, and that both

Special Condition (c) of the Permit and the performance standards in the CMP require Leeco to

maintain compensatory mitigation measures at the Spring Branch site until the Corps issues a

written determination that the mitigation was successful. Thus, as both the Corps and Leeco note,

although the initial monitoring period is five years, multiple materials in the record explicitly

state monitoring will continue until the mitigation project is deemed successful.

Plaintiffs, however, argue that under the language of § 332.6(b), the Corps has no

discretion here. Specifically, Plaintiffs point out that a monitoring of longer than five years "*must*

*be required for aquatic resources with slow development rates* (e.g., forested wetlands, bogs)." 33

C.F.R. § 332.6(b) (emphasis added). In support of their contention that this mandatory language

applies here, Plaintiffs note that in its Stream Compensation Ratio Calculator Version 3.4, the

Corps predicts that the mitigation work will "mature" in the year 2041—nearly thirty years in the

future. (DN 62-4.) Plaintiffs also cite to 73 Fed. Reg. 19,596, which notes that "there are some

aquatic resources types that are difficult to replace and streams are included among these."

Therefore, Plaintiffs contend the regulation "plainly requires" a monitoring period longer than

five years. The Court does not find that the mandatory language applies here. Although the

Corps has noted that streams are difficult to replace, this does not necessarily equate to having a

"slow development rate." Although Plaintiffs contend that thirty years is a long time, the Court

finds nothing in the record that allows it to conclude that this project does, in fact, involve an

aquatic resource with a slow development rate. Thus, this contention is without merit.

In their last argument regarding stream functions, Plaintiffs contend that the Corps arbitrarily

and capriciously failed to impose real ecological performance standards to measure whether the

mitigation is performing its expected functions, contrary to 33 C.F.R. § 332.5. This regulation

requires that an approved mitigation plan "contain performance standards that will be used to assess whether the project is achieving its objectives," and that such standards "should relate to the objectives of the compensatory mitigation project, so that the project can be objectively evaluated to determine if it is developing into the desired resource type, providing the expected *functions*, and attaining any other applicable metrics (e.g., acres)." 33 C.F.R. § 332.5(a) (emphasis added). Plaintiffs further point to § 332.2 of the regulations, which defines "functions" as "the physical, chemical, and biological processes that occur in ecosystems." *Id.* § 332.2. Thus, Plaintiffs argue, the performance standards in the mitigation plan approved here are unlawful because they do not measure improvements in physical, chemical, and biological processes at the Spring Branch mitigation site.

The Court finds the monitoring requirements are adequate. First, the primary requirement for performance standards is to ensure the "project can be objectively evaluated." *Id.* § 332.5(a). Plaintiffs do not contend the performance standards lack objectivity; rather, they contend they are inadequate because they do not address that ecological "processes" will be restored. The Plan's performance standards include a number of objective and verifiable attributes. As the Corps notes, the standards address stream morphology, stability, erosion control and vegetation that must be in place for the project to be considered successful. These adequately address "functions" to the extent they are required under the regulations. *See* 73 Fed. Reg. 19,594 (declining to specify the "type of functions" required, because the "definition is intended to have general applicability. . . . [and] should be based on the general concept of what an ecosystem function is").

Plaintiffs also reference the "multitude of comments—all of which went unaddressed by the Corps—explaining why EKSAP was not suited to assessing ecological function." (DN 69 at 8.)

To the extent that Plaintiffs criticize use of the EKSAP, the Court finds the Corps' reliance was not arbitrary and capricious. As the Corps notes in its Decision Document, the EKSAP's "principal purpose" is "to quantify and document the physical, chemical, and biological integrity of the nation's waters and to provide a tool for efficient, fair and reasoned decision-making that is scientifically and technically defensible." (Decision Document at 4.) Furthermore, the EKSAP incorporates the Kentucky Divison of Water's *Macroinvertebrate Bioassessment Index (MBI)*, which "serves as a statistically accurate and consistent indicator of the capacity of a headwater stream to perform aquatic functions (i.e., physical, chemical, and biological processes inherent to these aquatic systems)." (*Id.*) Based on the record before it, the Court does not find the Corps' reliance on this Protocol contrary to the 2008 Mitigation Regulations, nor is it arbitrary or capricious. Furthermore, as the Court has previously noted, in its Decision the Corps provides a detailed explanation of Plaintiffs' comments and, though it did not respond to them individually, the Corps included them in the Administrative Record and considered the comments of "interested parties to the public notice," which necessarily includes Plaintiffs. Plaintiffs' comments regarding the inadequacies were thorough and detailed. Although the Corps ultimately did not agree with those comments or outline its disagreement as extensively as Plaintiffs would have liked, the Corps did not ignore them. This does not render the Permit invalid. *See Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989) ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive").

### C.  The In-Lieu Fee Payments Were Appropriate

Plaintiffs also argue that the Corps acted inconsistently with its regulations by requiring a payment to the Kentucky Department of Fish and Wildlife ("KDFWR") Stream and Mitigation

Trust Fund (the "Trust Fund") because it failed to explain how the arrangement accounts for ecosystem function losses associated with the distance and delay of funded mitigation projects. The Corps' regulations provide for an in-lieu fee program, which is "a program involving the restoration, establishment, enhancement, and/or preservation of aquatic resources through funds paid to a governmental or non-profit natural resources management entity to satisfy compensatory mitigation requirements" for Corps permits. 33 C.F.R. § 332.2. "The operation and use of an in-lieu fee program are governed by an in-lieu fee program instrument," or "the legal document for the establishment, operation, and use of an in-lieu fee program." *Id.* Under the 2008 Mitigation Regulations, payments to in-lieu fee programs such as the Trust Fund are appropriate forms of compensatory mitigation. *Id.* § 332.3(a).

First, Plaintiffs contend that, although in-lieu fee mitigation activities may occur at a great distance from the impacted waterways, the Corps does not explain how Leeco's payment to the Trust Fund accounts for the "potentially enormous distance between the Stacy Branch mine's impacts and the funded mitigation projects." (DN 63 at 18.) The trust instrument between the Corps and the KDFWR ("In-Lieu Fee Instrument") divides the state into "service areas," which are used to account for mitigation credits and debits. (In-Lieu Fee Instrument, 25, DN 62-5.) These service areas are further divided into U.S. Geological Survey eight-digit Hydrologic Unit Code (HUC) watersheds. Here, the applicable service area is the Upper Kentucky River Area, which encompasses four HUC-8 watersheds and a little over 3,600 square miles. Based on this potentially large area, Plaintiffs argue that the Corps' contention that the mitigation will occur "in the vicinity of the impacted area," (Decision at 3, 5), is "flatly untrue," and its approval of such a plan is arbitrary and capricious.

The Court finds the Corps adequately accounted for distance in approving the mitigation. First, the mitigation plan consists of two parts: (1) Leeco's off-site mitigation of the Spring Branch site, which is within the *same* eight-digit HUC watershed as the Stacy Branch site; and (2) the in-lieu payment, which will be used to fund projects in the broader Upper Kentucky River Area. Thus, as a whole, the two-part approved mitigation plan accounts for "the distance between the affected aquatic resource and the compensation site." 33 C.F.R. § 332.3(f)(2). Second, the 2008 Mitigation Regulations specifically authorize in-lieu fee program service areas that encompass multiple HUCs. 33 C.F.R. § 332.8(d)(6)(ii)(A) (In rural areas, several contiguous 8–digit HUCs or a 6–digit HUC watershed may be an appropriate service area"). The Corps' approval in this regard was not arbitrary and capricious.

Secondly, Plaintiffs contend that the Corps violated its regulations by failing to account for temporal loss. The In-Lieu Fee Instrument indicates that:

> In general, implementation of compensatory mitigation projects will occur after sufficient funds are available in a Service Area to undertake a project. Permanent protection and initial physical or biological improvements shall begin by the end of the third full growing season after the mitigation credit(s) are sold unless the Corps determines that more or less time is needed to plan and implement a project.

(In-Lieu Fee Instrument at 11.) Plaintiffs note that this provision "introduces a great deal of uncertainty into the timing of the funded mitigation projects," (DN 63), but this provision is consistent with the Corps' regulations on the matter. 33 C.F.R. § 332.8(n)(4) ("Land acquisition and initial physical and biological improvements must be completed by the third full growing season after the first advance credit in that service area is secured by a permittee, unless the district engineer determines that more or less time is needed to plan and implement an in-lieu fee project").

Plaintiffs' challenge really centers on the Corps' application of "a flat 20 percent adjustment for temporal and cumulative losses." (Decision Document at 47.) Under the relevant regulations, the Corps "must require a mitigation ratio greater than one-to-one where necessary to account for . . . temporal losses of aquatic resource functions . . . ." 33 C.F.R. § 332.3(f)(2). "The rationale for the required replacement ratio must be documented in the administrative record for the permit action." *Id.* Plaintiffs contend that the Corps did not explain how the twenty percent adjustment rate is sufficient to account for temporal loss, and that its choice of this figure "appears to be nothing more than a wild guess." (DN 63 at 21.) However, the Corps noted in its Decision Document that the twenty percent flat adjustment is used as part of the EKSAP in-lieu fee calculator. The Corps' arrival at a particular formula is a scientifically complex determination and is entitled to significant deference. *See Ohio Valley Envtl. Coal., Inc. v. U.S. Army Corps of Engineers*, 883 F. Supp. 2d 627, 637-38 (S.D.W. Va. 2012) *aff'd*, 716 F.3d 119 (4th Cir. 2013). Though Plaintiffs may wish the Corps had explained their methodology further, the Plaintiffs never contested the methodology in their comments.[6] The Court finds the Corps adequately explained its rationale for the twenty percent adjustment as required under 33 C.F.R. § 332.3(f)(2).

Finally, Plaintiffs contend that neither the in-lieu fee instrument nor the Permit itself contain adequate assurances that the KDFWR's mitigation projects will restore stream functions, and reliance on them therefore violations the requirement that mitigation "compensate for the aquatic resource functions that will be lost as a result of the permitted activity." 33 C.F.R. §

---

[6] Plaintiffs point out that they could not have challenged the methodology because the Public Notice did not disclose it, but that "[t]he Corps' duty to explain its process for calculating the in-lieu fee mitigation is independent of its duty to respond to comments." (DN 69.) The Court does not deny Plaintiffs' motion because they did not raise the methodology issue in their comments, nor does it hold that the Corps does not have a duty to explain itself during the decision making process. Rather, the Court finds that the Corps sufficiently fulfilled its duty under 33 C.F.R. § 332.3(f)(2) in light of the arguments of which it was aware at the time it made its decision.

332.3. The In-Lieu Fee Instrument does adequately address stream functions. For example, the Instrument includes the following provision:

> Plans or projects with a primary purpose of improving or creating water supply, flood control or sanitary projects (sewer installation or improvements, straight pipe removal, septic system removal or installation, etc), or other water related improvements that do not involve aquatic habitat enhancement, rehabilitation, establishment, reestablishment, or preservation are not acceptable forms of out-of-kind mitigation and shall not be considered an acceptable type of compensatory mitigation under this Instrument.

(In-Lieu Fee Instrument at 9-10.) Thus, the Instrument specifically requires mitigation projects primarily involving "aquatic habitat enhancement, rehabilitation, establishment, reestablishment, or preservation." Furthermore, the Corps conducted an impact analysis under the EKSAP and found that a payment of $752,047.50 would offset the EIUs of impact to ephemeral streams. The Court has already rejected any argument that the EKSAP does not adequately address stream function.

### D. The Corps Adequately Addressed Downstream Water Conductivity

Plaintiffs raise two issues with how the Corps addressed water conductivity in connection with the Permit. First, Plaintiffs contend that, while recognizing the harmful nature of conductivity in its Decision, the Corps failed to include in its adaptive management plan ("AMP") how it will ameliorate the problem. In their responses, both the Corps and Leeco outline in great detail the monitoring procedures that will enable the Corps to assess high levels of conductivity coming from the Hollowfill at the Stacy Branch Mine. Plaintiffs, however, clarify that their "problem with the Adaptive Management Plan is that, once the Corps discovers high conductivity levels, it will not be able to do anything about them" under the terms of the plan. (DN 69 at 14.) However, the Court finds the Corps' analysis was sufficient. Special

Condition (d) of the Permit describes in detail the monitoring process Leeco will be required to undertake. Special Condition (d) further indicates that:

> If the 6-month rolling average remains greater than 400 µS/cm for 6 months after implementing the AMP, the permittee will retain, within 30 days, a consultant mutually agreed upon by the permittee and the Corps. The consultant shall prepare within 90 days, recommendations for additional actions to reduce effluent conductivity. These recommendations shall be implemented within 45 days of written approval by the Corps unless a longer period of time is granted.

(Decision Document at 53.) Thus, the AMP sets out a specific series of events that will occur within a specific time frame to address heightened conductivity levels. Although there is flexibility in the precise actions that will be taken to combat the activity level, such flexibility is not improper here, where there are specific requirements that will guarantee action by the parties. *See Ohio Valley Envtl. Coal., Inc.*, 883 F. Supp. 2d at 636 ("While the AMP does not require specific remedial actions in the event that mitigation is unsuccessful, it gives the Corps the right to require compliance in any way that the Corps sees fit. In light of the inherent uncertainty in the mitigation process . . . the Court cannot conclude that the adoption of the AMP was arbitrary & capricious.")

Finally, Plaintiffs contend that the AMPs fail to take into account 1,106 linear feet of ephemeral streams that do not flow through the valley fill and, therefore, the Corps failed to make required factual determinations regarding these impacts. However, the record shows the Corps did address these impacts. The Decision Document specifically notes that the AMPs account for approximately 94% of the impacts from the permitted activity. The Decision further explains that the remaining six percent constituted "mining-through" impacts that "are very limited" because the impacted streams are ephemeral and carry only surface runoff. Based on this analysis, the Corps declined to require benthic or conductivity measurements for these

impacts. The Court finds that the Corps adequately explained its reasoning for not requiring monitoring of the ephemeral streams. Thus, its actions were not arbitrary and capricious.

## CONCLUSION

Plaintiffs make a number of compelling and well-documented arguments. Were the Court deciding the Permit issue in the first instance, perhaps its opinion would be different. However, under the highly deferential standard of review afforded to the Corps, the Court finds it did not act unreasonably. Though, as Plaintiffs' arguments illustrate, reasonable minds could differ on many of the issues decided by the Corps, the Corps adequately analyzed the issues before it before issuing the Permit. Because the Court finds the Corps did not act arbitrarily and/or capriciously, Plaintiffs' motions (DN 21 & 62) are DENIED and Defendants' motions are GRANTED (DN 33, 34, 66 & 68). An appropriate order shall issue.


Date:


CC:          Counsel